Adam D. Brumm, Esq.  SBN#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>            Plaintiff,<br><br>      vs.<br><br>FRESNO FAB-TECH, INC., a California corporation; and DOES 1-10, inclusive,<br><br>            Defendant. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

**INTRODUCTION**

1.     This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and remediation against Defendant, Fresno Fab-Tech, Inc., for current and ongoing violations of

COMPLAINT – Page 1

the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.     On or about June 18, 2022, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board"), and (4) to Defendant, including a copy delivered to the facility Manager of Defendant Fresno Fab-Tech, by certified mail, at 1035 K Street, Sanger, California ("the facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.     A copy of EDEN's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.     More than sixty ("60") days have passed since EDEN's Notice was properly and lawfully served on Defendant, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

### JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.      The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5[th] 749 (2016)).

7.      By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A).

8.      Venue is proper because Defendant resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

**PARTIES**

9.      Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California.

10.     EDEN's organizational purpose is the protection, preservation, and enhancement of the rivers, creeks, streams, lakes, oceans, and their tributaries located in California.

11.     EDEN's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress against Industrial Dischargers who violate the Clean Water Act by failure to comply with all standard conditions of the Industrial General Permit.  These standard conditions include, but are not limited to, discharges of polluted stormwater in violation of Federal and California criteria, deficient Stormwater Pollution Prevention Plans and Site Maps,

deficient stormwater monitoring and sampling programs/protocols and reporting, deficient best management practices, deficient or non-existing exceedance response action reports, deficient or non-existing employee stormwater training programs, deficient or non-existing annual reports and other informational deficiencies.

12.     EDEN's associational members volunteer their resources to join EDEN's organizational purpose and mission.

13.     EDEN has associational members throughout Northern California.  Some of EDEN's members reside, work, and/or recreate near the Kings River, a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant's storm water run-off), and use those waters and their watersheds for kayaking, canoeing, camping, cycling, recreation, sports, fishing, swimming, hiking, bird watching, photography, nature walks, and scientific study.  Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

14.     EDEN has Article III standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing an ongoing, concrete, and particularized injury that is fairly traceable to Defendant's violations of the Clean Water Act and Industrial General Permit, which can be redressed by a judicial decision granting EDEN the injunctive relief requested herein.

15.     Specifically, the aesthetic and recreational interests of the individual associational members of EDEN with Article III standing have been adversely impacted by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act, as delineated herein.

16.     In addition to harming the aesthetic and recreational interests of EDEN's members with standing in this matter, Defendant's procedural violations of the standard conditions of California's Industrial General Permit have caused informational injuries to EDEN's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendant's compliance with standard conditions of California's Industrial General Permit as delineated herein. These provisions have been instituted by the relevant regulatory agencies for the purposes of protecting the Waters of the United States.

17.     EDEN's associational members who qualify for standing in this matter are current members who have been members of EDEN since at least the date that EDEN provided to Defendant the 60-day Notice of Intent to Sue attached hereto as **Exhibit A.**

18.     Defendant's ongoing violations of the General Permit and the Clean Water Act have and will continue to cause irreparable harm to EDEN and its current standing members.

19.     The relief requested herein will redress the ongoing injury in fact to EDEN and its members.

20.     Neither litigation of the claims asserted nor the relief requested in this Complaint will require the participation in this lawsuit of any individual members of EDEN.

21.     EDEN is informed and believes, and on such information and belief alleges that Defendant, Fresno Fab-Tech, Inc., located at 1035 K Street, in Sanger, California, is a California corporation in good standing with the California Secretary of State.

22.     EDEN is informed and believes, and on such information and belief alleges that Defendant, Fresno Fab-Tech, Inc., is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the facility.

## STATUTORY BACKGROUND

23.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

24.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

25.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342(p).

26.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board ("Water Board") to issue NPDES permits, including general NPDES permits in California.

General Permit

27.     The State Board elected to issue a statewide general permit for industrial storm-water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to

Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

28.     On November 16, 2018, the State Water Board adopted a revised General Permit (Order No. 2018-XXXX-DWQ, which technically became effective on July 1, 2020).  However, the 2018 Revisions have not officially been finalized or certified by the Clerk of the State Water Board as of the date of this Complaint.

29.     In order to discharge stormwater lawfully in California, all industrial facilities discharging, or having the potential to discharge stormwater associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

30.     The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

31.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires Dischargers to reduce or prevent pollutants in their stormwater discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits stormwater discharges and authorized non-stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

32.     Receiving Water Limitation VI(B) of the General Permit prohibits stormwater discharges to any surface or ground water that adversely impact human health or the

environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit stormwater discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

33.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that Dischargers must meet.

34.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in stormwater discharges and authorized non-stormwater discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

35.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

36.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit Fact Sheet § I(1).

37.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team, a site map, a

list of significant materials handled and stored at the site, a description of potential pollutant sources, an assessment of potential pollutant sources, and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges.

38.     The General Permit further requires dischargers to implement and maintain to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial stormwater discharges: exposure minimization BMPs, stormwater containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

39.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

40.     The General Permit requires Dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

41.     As part of their monitoring program, Dischargers must identify all stormwater discharge locations that produce a significant stormwater discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequately and properly implemented.

42.     Section XI(B) of the General Permit requires that Dischargers collect and analyze stormwater samples from two ("2") qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two ("2") QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

43.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2).

44.     Once the stormwater samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report. General Permit § XI(B)(4).

45.     Facilities are also required to make monthly visual observations of stormwater discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A).

46.     The General Permit requires operators to conduct an Annual Comprehensive facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV.

47.     Under the General Permit, facilities must analyze stormwater samples for pH, oil & grease, and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that

serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

48.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial stormwater has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a stormwater discharge could potentially impair, or contribute to impairing water quality, or affect human health from ingestion of water or fish.

49.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs which are derived from the 2008 MSGP benchmark values and instantaneous maximum NALs, which are derived from a Water Board dataset.

50.     The following annual NALs have been established under the General Permit for pollution parameters applicable to all Dischargers: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, nitrite + nitrate as nitrogen --.68 mg/L, zinc --.26 mg/L, phosphorus --2.0 mg/L, aluminum – .75 mg/L, lead – .262 mg/L, copper – .0332 mg/L, nickel – 1.02 mg/L and chemical oxygen demand – 120 mg/L.

51.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH. General Permit §XII(A).

52.     When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status". General Permit § XII(C).

53.     For Level 2 Status, a Discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit §XII(D).

54.     The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS"). SMARTS is a platform where dischargers, regulators, and the public can enter, manage, and view stormwater data associated with General Permit compliance.

55.     The General Permit requires Dischargers to upload to SMARTS all Permit Registration Documents, including SWPPPs and Site Maps, monitoring and sampling data, and Annual Reports.

56.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

57.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the facility with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified

personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

58.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or both.  *See also* Clean Water Act section 309(c)(4).

Central Valley Region Basin Plan

59.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

60.     The beneficial uses of these waters include, *inter alia*, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

61.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

62.    The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

63.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

64.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

65.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

66.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

67.    Title 22 of the California Code of Regulations provides a MCL for aluminum of 1.0 mg/L, for cadmium of .01 mg/L, and lead of .05 mg/L.

68.    The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

69.    The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

70.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

Citizen Suit Provision of the CWA

71.    Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation." 33 U.S.C. §1365(a)(1). No action may be commenced prior to sixty ("60") days after the plaintiff has given notice of the alleged violation to (i) the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced either by the government or by concerned citizens.

72.    In furtherance of the water preservation goals established by the CWA, the citizen suit provision affirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, and $56,460.00 per violation, per day, for violations

occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

73.     Violations of provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS

74.     Defendant, Fresno Fab-Tech Inc., is a facility that fabricates structural steel for commercial building construction.  EDEN is informed and believes that the facility falls under standard industrial classification ("SIC") code 3441.

75.     EDEN is informed and believes that Defendant, Fresno Fab-Tech Inc., stores industrial materials outdoors that can be exposed to stormwater, eroded by wind, and otherwise contaminate the surrounding watershed.

76.     Plaintiff is informed and believes, and thereupon alleges that during rain events, stormwater flows over the surface of the facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that stormwater flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the facility's stormwater channels.

77.     Based on EDEN's investigation, including a review of the Defendant's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, Federal, State, and local regulatory agency mapping tools, and EDEN's information and belief, stormwater leaves the boundaries of Defendant's facility and initially

enters the Sanger City Storm Drain System before reaching the Kings River, which is a navigable Water of the United States.

78.     Plaintiff is informed and believes, and thereupon alleges, that the best management practices at the facility are currently inadequate to prevent the sources of contamination described above from causing discharge of pollutants to Waters of the United States.

Deficient SWPPP/Failure to Follow SWPPP

79.     On information and belief, Plaintiff alleges that since at least December 1, 2017, Defendant has failed to implement an adequate SWPPP for its facility.

80.     Plaintiff notes that on August 23, 2022 (after Plaintiff's Notice Letter was served), Defendant uploaded to SMARTS, a revised SWPPP and Site Map. However, the revised SWPPP and Site Map remain non-compliant with the General Permit.

81.     Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP and Site Map do not include each of the mandatory elements required by Section X of the General Permit.

82.     Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP and Site Map do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit.

83.     According to information available to EDEN, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

84.     Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP does not set forth site-specific Best Management Practices (BMPs) for the facility that are consistent with BAT or BCT.

85.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the facility's SWPPP and site-specific BMPs consistent with the General Permit.

86.     In addition, Plaintiff alleges that Defendant has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

87.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Kings River.

88.     Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP are ongoing and continuous.

Monitoring and Reporting

89.     On information and belief, EDEN alleges that Defendant has an inadequate monitoring program at its facility.

90.     On information and belief, EDEN alleges that since December 1, 2017, Defendant has failed to collect and analyze two stormwater samples from the first half of each reporting year, and two stormwater samples from the second half of each reporting year, as required by General Permit §XI(B).

91.     On information and belief, EDEN alleges that Defendant has failed to conduct monthly visual observations of stormwater discharges at the facility since at least December 1, 2017.

92.     EDEN is informed and believes that Defendant has failed to upload facility storm water sample analyses within 30 days of obtaining the results of the sampling event, in violation of Section XI(B)(11) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

Falsification of Annual Reports

93.     EDEN is informed and believes that since December 1, 2017, Defendant has submitted inaccurate and/or falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

Failure to Implement BAT/BCT and BMPs

94.     EDEN is informed and believes that since at least December 1, 2017, Defendant has failed to identify and implement Best Management Practices ("BMPs") at its facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability. General Permit §§ I(C), V(A).

95.     Defendant's BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A**.

96.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the Kings River.

Discharges of Contaminated Storm Water

97.     Information available to EDEN indicates that unauthorized non-stormwater discharges occur at the facility due to inadequate BMP development and/or implementation necessary to prevent these discharges, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

98.     Due to the nature of the operations at the facility, coupled with the documented lack of proper BMP implementation and unauthorized non-stormwater discharges, Defendant is discharging stormwater containing excessive levels of pollutants specific to its operation during at least every significant local rain event.

99.     Since at least March 1, 2018, Defendant has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

100.    Since at least March 1, 2018, Defendant has reported numerous discharges in excess of the benchmark value and annual numeric action limits established by EPA and the Water Board, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

Failure to Comply with Required Exceedance Response Actions (ERAs)

101.    On July 1, 2016, Defendant was elevated to Level 1 Status for exceedances of Total Suspended Solids, Iron, Aluminum, Nitrates (N+N) and Zinc.

102.    On July 1, 2017, Defendant was elevated to Level 2 Status for exceedances of Total Suspended Solids, Iron, Aluminum, Nitrates (N+N) and Zinc.

103.    Pursuant to Section XII of the General Permit, Defendant's Level 1 ERA Report was due to be prepared and uploaded into SMARTS by January 1, 2017; its Level 2 ERA Action

Plan was due by January 1, 2018; and its Level 2 ERA Technical Report was due by January 1, 2019.

104.    Defendant submitted a Level 1 ERA report on December 22, 2016, and a Level 2 ERA Action Plan on May 29, 2018.

105.    However, to date, Defendant has failed to submit a Level 2 ERA Technical Report.

106.    Defendant's Level 2 ERA Technical Report has thus been outstanding since January 1, 2019.

Failure to Train Employees

107.    The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

108.    Plaintiff is informed and believes that since at least December 1, 2017, Defendant has failed to implement and train a Pollution Prevention Team at its facility.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

109.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

110.    The General Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP.

111.    As outlined herein, Defendant has failed to develop and implement an adequate SWPPP for its facility.

112.    Each day since December 1, 2017 that Defendant has failed to develop, implement, and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

113.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

114.    The General Permit requires dischargers of stormwater associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

115.    As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility.

116.    Each day since at least December 1, 2017 that Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

### THIRD CAUSE OF ACTION
### Submission of False Annual Reports to the Regional Water Board
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

117.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

118.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information.

119.    Specifically, Clean Water Act section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty to any person who knowingly makes a false material statement, representation or certification in any record or other documents submitted or required to be maintained under the General Permit, including Annual Reports, up to and including a fine of $10,000 and imprisonment of two years, or both.

120.    As delineated herein, Defendant Fresno has made false representations in the facility's Annual Report(s).

121.    Each time since December 1, 2017 that Defendant submitted false statements to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### FOURTH CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

122.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

123.    The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their stormwater discharges through implementation of BAT for toxic and non-conventional pollutants and BCT for conventional pollutants.

124.    As alleged herein, Defendant has failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

125.    Each day since at least December 1, 2017 that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

126.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

127.    Discharge Prohibition III(C) of the General Permit prohibits stormwater discharges and authorized non-stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water VI(B) of the General Permit prohibits stormwater discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit stormwater discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

128.     Plaintiff is informed and believes, and thereupon alleges, that since at least December 1, 2017, Defendant has been discharging polluted stormwater from its facility in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

129.     During every rain event, stormwater flows freely over exposed materials, waste products, and other accumulated pollutants, becoming contaminated with pollutants associated with the industrial activity occurring at Defendant's facility. The polluted storm water then flows untreated into the Kings River.

130.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated stormwater are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

131.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated stormwater are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

132.     Every day since at least December 1, 2017 that Defendant has discharged and continues to discharge polluted stormwater from its facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

### SIXTH CAUSE OF ACTION
### Failure to Comply with Required Exceedance Response Actions
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

133.     Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

134.    The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

135.    As herein alleged, Defendant has failed to date to comply with the Exceedance Response Actions required of it by the General Permit.

136.    Each day since December 1, 2017 that Defendant has failed to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**SEVENTH CAUSE OF ACTION**
**Failure to Properly Train facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

137.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

138.    Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

139.    Section X(H)(f) of the General Permit also requires that each facility ensure that Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

140.    Since at least December 1, 2017, Defendant has failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.  This violation is ongoing and continuous.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendant to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendant to immediately operate its facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendant from discharging pollutants to the surface waters surrounding its facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.    Order Defendant to pay civil penalties of $56,460.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendant to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.    Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.    Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in

Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

      8.     Award such other and further relief as may be just and proper.


Dated:  November 29, 2022                      Respectfully,


                                 By:  ___*/S/ Adam D. Brumm*_____
                                   Adam D. Brumm
                                   Attorney for Plaintiff